UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
VINCENT SWINNIE,

                        Petitioner,

          – against –

WILLIAM PHILLIPS, SUPERINTENDENT
OF THE GREEN HAVEN CORRECTIONAL
FACILITY.

                        Respondent.
------------------------------------------------------x

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y
★   JUL 3 1 2009
P.M.
TIME A.M.

**MEMORANDUM and ORDER**

05-CV-1579 (SLT)

**TOWNES, United States District Judge:**[1]

In June 2001, in the Supreme Court of the State of New York, Queens County, a jury convicted petitioner Vincent Swinnie of two counts of murder in the second degree, two counts of attempted robbery in the first degree, and one count each of attempted robbery in the second degree, criminal possession of a weapon in the second degree, and criminal possession of a weapon in the third degree. Petitioner appealed, and on October 6, 2003, the Appellate Division affirmed the conviction. After being denied leave to appeal by the Court of Appeals on December 30, 2003, petitioner commenced this action on March 16, 2005, by filing a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons set forth below, the instant petition for a writ of habeas corpus is denied.

### BACKGROUND

On December 24, 1999, Bradley Durant was shot and killed in his backyard at 107-30 170th Street in Jamaica, Queens. New York City Police Detective Orlando Quintero was

---

[1] The Court gratefully acknowledges the assistance of a student intern, Ali Russell of Boston College Law School, in the preparation of the Memorandum and Order.

assigned to the case and, in the course of canvassing the neighborhood, spoke with two witnesses: Eugene Callabrass and Donald Frazier. Callabrass, who witnessed the shooting itself, identified petitioner as the shooter at a line-up conducted by Quintero. Frazier, a longtime friend of petitioner's, stated that he unwittingly drove petitioner to a house on the same street as Durant's.

Quintero arrested petitioner on January 6, 2000. Petitioner was ultimately indicted on two counts of murder in the second degree, two counts of attempted robbery in the first degree, and one count each of attempted robbery in the second degree, criminal possession of a weapon in the second degree, and criminal possession of a weapon in the third degree. On May 29, 2001, he went to trial before Justice Eng and a jury.

## The Trial

### The Prosecution Case

Eugene Callabrass, a handyman Bradley Durant had hired to install vinyl siding on his garage, was the only eyewitness to testify at trial (T. 584).[2] Callabrass testified that at approximately 3:00 p.m. on December 24, 1999, he was finishing the repairs to Durant's garage when a man, whom Callabrass later identified as petitioner, came around the corner of the garage (T. 572, 593-94). Callabrass exclaimed that petitioner had frightened him, but petitioner only asked for Durant (T. 572). When Callabrass again stated that he had been frightened, petitioner apologized yet asked once more for Durant (T. 572). Petitioner then left the yard, and Callabrass saw him meet up with another man (T. 573). The exchange between Callabrass and petitioner lasted less than a minute (T. 575).

---

[2] Numbers in parentheses preceded by "T" refer to page numbers in the trial transcript, and pages preceded by "S" refer to pages in the transcript of the June 28, 2001, sentencing.

Later in the afternoon, Callabrass heard noises coming from the other side of the garage (T. 577). Upon investigating, he saw petitioner holding a gun to Durant's head (T. 577, 600). Petitioner was not wearing a mask, hat, or glasses to obscure his appearance (T. 579). Callabrass heard petitioner demand keys from Durant (T. 577).

Petitioner told Callabrass to go back behind the garage, but before he could, Callabrass was attacked by a man in a ski mask (T. 579). As the two wrestled to the ground, Callabrass saw Durant attempt to grab petitioner's gun. Durant and petitioner then began fighting (T. 579).

Although Callabrass attempted to assist Durant, the masked man prevented Callabrass from doing so (T. 581). Callabrass looked over to see Durant lying on the ground, with petitioner standing over him (T. 583). Callabrass made eye-contact with petitioner, who then turned and shot Durant in the leg (T. 583-84).[3] Upon witnessing the shooting, the masked man fled the backyard (T. 584). Callabrass begged petitioner to let him take Durant to the hospital (T. 584). Petitioner did not respond but slowly walked out of the backyard (T. 638).

When Callabrass ran out of the backyard searching for help, he again saw petitioner and slowed his pace to keep out of sight (T. 586). He noticed that petitioner got into a dark-colored car (T. 588).

Callabrass knocked on the door of Durant's house but received no response, even though there were people inside (T. 641). Callabrass then asked a woman passing on the street to call the police (T. 642). Receiving no confirmation from the woman that she would call on his behalf, Callabrass returned to Durant's house and sat in his van parked in the driveway until the police arrived (T. 642-43).

Once police officers arrived at the scene, Callabrass spoke briefly with Detective Quintero, who then escorted Callabrass to the 103rd Precinct for more questioning (T. 589, 795).

---

[3] The bullet struck and perforated Durant's left thigh femoral artery, which caused his death (T. 862).

3

There, Callabrass gave detectives a physical description of petitioner (T. 592). On January 6, 2000, Callabrass returned to the 103rd Precinct to view a line-up. Within a minute, Callabrass identified petitioner as the perpetrator (T. 596-97, 843).

On cross-examination, defense counsel questioned Callabrass extensively about the events of December 24, 1999. Callabrass admitted that he was not sure of the times of the different interactions with petitioner, nor of when the shooting occurred (T. 649-51). His description of the height, weight, and hairstyle of the perpetrator varied somewhat, but Callabrass remained firm on his belief that petitioner was, in fact, the shooter (T. 593, 646-48).

Defense counsel tried to impeach Callabrass's credibility by establishing that he had prior criminal convictions. However, on redirect-examination, Callabrass stated that his prior convictions were more than twenty years old and did not affect his ability to see and perceive events (T. 688, 695, 958-59).

Defense counsel also asked Callabrass if he remembered telling Officer Mark Cayne that he was working on the garage when he heard a loud bang and noticed two individuals fleeing the yard (T. 637-38). However, Callabrass denied telling Cayne that he did not witness the crime and reaffirmed that he was actually present when the shooting occurred (T. 637-38).

Donald Frazier testified that he had been with his lifelong friends, petitioner and Rodney Archie, on the afternoon of December 24, 1999 (T. 724, 726, 730). Petitioner asked Frazier to drive him and Archie to "Craig and Jay's" house to "pick up some music material" (T. 731, 733). Frazier, who had been to Craig and Jay's house two or three times before, agreed to do so (T. 741, 783). He drove the two, in a dark green Acura, to Craig and Jay's house in the "Bricktown" section near Liberty and Merrick Streets (T. 731-32, 734).

4

Upon arrival, petitioner told Frazier to move the car to the other side of the street, which Frazier did (T. 736). Since he was parking the car, Frazier did not see where petitioner and Archie went (T. 737). Frazier then put on headphones and listened to music for between five and fifteen minutes until Archie appeared and got into the backseat of the car (T. 738-39). Frazier remembered that Archie was quiet and expressionless when he returned to the car (T. 739). A few minutes later, petitioner re-entered the car, remarked that he "did what he had to do," and told Frazier, "Let's go." (T. 740).

Detective Orlando Quintero testified that he had interviewed a person by the name of Craig in the course of his investigation (T. 809). However, when the prosecution attempted to ask where "Craig" lived, defense counsel objected (T. 809). At a sidebar, defense counsel articulated the basis for his objection as follows:

> My objection is Donald Frazier never indicated that he was going to an individual by the name of Craig Young's house. There are many, many people by the name of Craig (T. 810).

Justice Eng overruled the objection, saying:

> We have testimony now that the witness has talked to a Craig Young. We know that there is a Craig involved in these facts and circumstances. It may not be Craig Young. However, there is enough of a connection here so that any objections will go the weight rather than the admissibility of the evidence (T. 815).

Shortly after issuing this ruling, the trial court invited the parties to state their position with respect to the issue of "whether or not ... Detective Quintero ... [was] competent to testify that he interviewed an individual named Craig Young and that Craig Young lived at and was associated with 107-28 170th Street" (T. 822). Defense counsel used the opportunity to re-visit the issue of whether the prosecution was properly permitted to offer Quintero's testimony concerning Craig Young in the first place. Defense counsel stated:

5

> The point is there are many different Craigs. If the People would have come forward or if this detective would have ... taken Mr. Frazier to that location and said, "Is this the Craig's house that you were talking about?" Then we wouldn't be putting in front of the jury sheer speculation that this is the same Craig (T. 823).

The court was not persuaded to reconsider its earlier ruling. Rather, the trial court reaffirmed that ruling, stating:

> The Court finds once again that there is sufficient evidence in the record to permit this testimony. There has been substantial testimony about a Craig and it would be reasonable to infer that Craig Young is the Craig that the testimony has been about. However, the arguments that are made by the defense goes [sic] to the weight, not for admissibility (T. 825).

The trial court then permitted Quintero to testify that he had gone to a house located at 107-28 170th Street, where he had spoken to an individual named Craig (T. 827-28).

### *The Defense Case*

Following the close of the People's case, and after defense counsel moved unsuccessfully to dismiss all counts for failure to prove a prima facie case, defense counsel called Officer Cayne to testify about the police report that he had written regarding statements made by Callabrass. The report stated that Callabrass heard Durant get into an argument over keys and then later heard a loud bang (T. 908.) However, Cayne stated that the report was not a verbatim account of Callabrass's statement and suggested that he might have paraphrased his conversation with Callabrass when he wrote the report three hours later (T. 909, 918-19).

### *Verdict and Appeal*

On June 7, 2001, the jury found petitioner guilty of two counts of murder in the second degree, two counts of attempted robbery in the first degree, and one count each of attempted robbery in the second degree, criminal possession of a weapon in the second degree, and criminal possession of a weapon in the third degree (T. 1071-72). On June 28, 2001, Justice Eng

6

sentenced petitioner to two concurrent terms of twenty-five years to life imprisonment on the murder counts. Justice Eng also sentenced petitioner to determinate terms of between seven and fifteen years on each of the lesser counts, all of which were to run concurrently with each other and the two murder sentences (S. 19-20).

On direct appeal to the Appellate Division, Second Department, petitioner raised two grounds. First, petitioner made an insufficiency of the evidence claim, arguing (1) that "the People failed to prove beyond a reasonable doubt [petitioner's] identity because their case rested almost exclusively" on the inconsistent testimony of Callabrass, a convicted felon, and (2) that petitioner's conviction was against the weight of the evidence. Second, petitioner argued that the trial court violated his due process right to a fair trial by admitting Quintero's testimony regarding Craig Young (Pet'r's Appellate Br. 18, 24.)

On October 3, 2003, the Appellate Division, Second Department, affirmed petitioner's conviction, ruling that his first claim had not been preserved for appellate review and was, therefore, procedurally barred. People v. Swinnie, 309 A.D.2d 774, 765 N.Y.S.2d 58 (N.Y. App. Div. 2003). The court went on, however, to address the merits of the claim and found that the evidence was "legally sufficient to establish the defendant's guilt beyond a reasonable doubt" and that "the verdict ... was not against the weight of the evidence." Id., 309 A.D.2d at 774, 765 N.Y.S.2d at 59. Additionally, the court decided that petitioner's objections to the admissibility of Quintero's testimony regarding the identity of Durant's next-door neighbor went to the weight of the evidence rather than its admissibility. Id. Petitioner requested leave to appeal the Appellate Division decision to the Court of Appeals, but that application was denied on December 30, 2003. People v. Swinnie, 1 N.Y.3d 581, 775 N.Y.S.2d 797 (N.Y. 2003).

Petitioner filed a habeas petition with this Court in mid-March 2005. However, his petition did not state the grounds upon which he was seeking review. As a result, respondent filed a motion to dismiss the petition pursuant to Rule 2 of the Rules Governing Section 2254 cases. In February 2006, this Court denied this motion and directed respondents to construe the petition as challenging petitioner's conviction on the same grounds raised on direct appeal. Swinnie v. Phillips, No. 05-CV-1579 (SLT), slip op. at 3 (E.D.N.Y. Feb. 16, 2006).

Respondent subsequently filed opposition papers addressing the two grounds raised by petitioner on direct appeal. With respect to the first ground, respondent argued that petitioner's claim of insufficiency of evidence was procedurally barred. With respect to the second ground, respondent contended that petitioner only attacked an evidentiary ruling, that the evidence was relevant, and that even if it were not, its admittance was not so egregious as to deny petitioner a fair trial.

## *DISCUSSION*

I. Sufficiency of the Evidence Claim

When a state prisoner has defaulted a federal claim in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claim "is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[] will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991), see Glenn v. Bartlett, 98 F.3d 721, 724 (2d Cir. 1996). If a state court decision "explicitly invokes a state procedural bar rule as a separate basis for decision" on a federal claim, then a federal habeas court may not review the claim absent cause and prejudice or a fundamental miscarriage

of justice, even if the state court also rejected the claim on the merits in the alternative. See Harris v. Reed, 489 U.S. 255, 264 n.10 (1989).

In this case, the Appellate Division expressly stated that petitioner's sufficiency of the evidence claim was procedurally barred pursuant to New York Criminal Procedure Law ("CPL") § 470.05[2]. Although the Appellate Division also reached the merits, noting that there was sufficient evidence to support the conviction, Swinnie, 309 A.D.2d at 774, 765 N.Y.S.2d at 59, the court's express reliance on CPL § 470.05[2] forecloses habeas review unless petitioner can show either 1) cause and prejudice or 2) a fundamental miscarriage of justice. See Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990); see also Glenn, 98 F.3d at 724.

In this case, petitioner has shown neither cause and prejudice nor a fundamental miscarriage of justice. In order to establish "cause," petitioner must generally "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986). Trial counsel's failure to raise a claim does not constitute "cause" for a procedural default unless that failure rises to the level of ineffective assistance of counsel. Id. Moreover, even though ineffective assistance can constitute "cause," a claim of ineffective assistance generally must be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default. Id.

In this case, petitioner has not alleged, and there is nothing to suggest, that any factor external to the defense prevented defense counsel from preserving the sufficiency argument. Defense counsel's failure to do so was not ineffective assistance because Callabrass's testimony alone was sufficient to establish petitioner's guilt beyond a reasonable doubt. Moreover, even assuming that defense counsel's failure to preserve the argument rose to the level of ineffective

9

assistance, petitioner never raised the ineffective assistance argument in state court, and therefore, cannot use it here to establish "cause."

Even assuming, arguendo, that petitioner could establish cause, he could not establish prejudice. In order to establish "prejudice," petitioner must prove "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis omitted); see Engle v. Isaac, 456 U.S. 107, 135 (1982). Since the Appellate Division ruled in this case that the evidence was "legally sufficient to establish the defendant's guilt beyond a reasonable doubt," Swinnie, 309 A.D.2d at 774, 765 N.Y.S.2d at 59, petitioner could not succeed in proving that there is a reasonable probability the result of the trial would have been different but for defense counsel's failure to preserve the sufficiency argument. See Strickler v. Greene, 527 U.S. 263, 289 (1999); Murray, 477 U.S. at 494; Frady, 456 U.S. at 168.

Petitioner also cannot establish a fundamental miscarriage of justice. To do so, a petitioner must prove that he is actually innocent through new, reliable evidence that was not presented at trial. Schlup v. Delo, 513 U.S. 298, 321, 324 (1995). Here, petitioner has provided no new evidence exonerating himself.

Since petitioner can show neither a fundamental miscarriage of justice nor cause and prejudice relating to defense counsel's failure to preserve the sufficiency argument, this Court is barred from reviewing this sufficiency argument. See Coleman, 501 U.S. at 750. However, even if this Court were to reach the merits of this claim, it would not grant petitioner any relief. Upon a sufficiency claim, a petitioner is only entitled to habeas corpus relief if, upon the record evidence adduced at trial, no "rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see Herrera v. Collins, 506 U.S. 390, 401 (1993). In addition, a reviewing court "must consider the evidence in the light most favorable to the prosecution and make all inferences in its favor." Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 811 (2d Cir. 2000) (citing Jackson, 443 U.S. at 319). The petitioner, therefore, bears a "very heavy burden" in convincing a court to grant his petition based on insufficiency of evidence. Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002); Fama, 235 F.3d at 811.[4]

In this case, Callabrass's testimony provided sufficient evidence to establish that petitioner was the man who shot Durant. Callabrass testified that he had an opportunity to see petitioner – his face unobstructed – in broad daylight on three occasions. Callabrass even spoke to petitioner and made direct eye-contact on two of the occasions. Furthermore, when viewing a line-up more than two weeks later, it took Callabrass less than a minute to identify petitioner as the shooter.

To be sure, there were some inconsistencies and contradictions in Callabrass's account of the incident. Callabrass's descriptions of the shooter varied with respect to how tall he was, how much he weighed, and whether or not he had facial hair. Callabrass also could not remember what time of day the events took place. However, the jury could have credited – and apparently did credit – Callabrass's testimony despite its inconsistencies and despite the fact that Callabrass was a convicted felon. The absence of corroboration and the credibility of the witness go to the weight of the evidence, which is a matter for the jury – and not this Court – to decide. Herrera, 506 U.S. at 401-02; United States v. Parker, 903 F.2d 91, 97 (2d Cir. 1990).

---

[4] Petitioner's weight of the evidence claim cannot be reviewed because "[i]t is well established that 'weight of the evidence' claims are not cognizable on federal habeas review." Taylor v. Poole, 538 F Supp 2d 612, 618 (S.D.N.Y. 2008); see Herrera, 506 U.S. at 401-02.

II. Due Process Violation Claim

As a second ground for habeas corpus relief, petitioner argues that his due process right to a fair trial was violated by the trial court's decision to admit Quintero's testimony that Durant's next-door neighbor had the same first name as the individual to whose house Frazier had driven petitioner shortly before the shooting. In order to prevail on a claim that an evidentiary error deprived the petitioner of due process, petitioner must show that "the erroneously admitted evidence, viewed objectively in light of the entire record before the jury," provided the basis for a conviction or removed a reasonable doubt that would have existed on the record without it. Collins v. Scully, 755 F.2d 16, 19 (2d Cir. 1985).

In this case, petitioner's argument fails for two reasons. First, the trial court's decision was not erroneous. "Evidence is relevant if it has any tendency in reason to prove the existence of any material fact." People v. Scarola, 71 N.Y.2d 769, 777, 530 N.Y.S.2d 83, 86 (N.Y. 1988). Although relevant evidence may be excluded if its probative value is outweighed by prejudice to the petitioner, petitioner never alleged that Quintero's testimony prejudiced him. Instead, petitioner's counsel objected to the evidence on the ground that it did not establish that the next-door neighbor was the "Craig" to whose house Frazier had driven. (Pet'r's Appellate Br. 27.)

As the Appellate Division held, this objection went to the weight of the evidence and not its admissibility. Swinnie, 309 A.D.2d at 774, 765 N.Y.S.2d at 59. In so ruling, the Appellate Division implied that the evidence was in fact admissible under New York law. This Court cannot second-guess this Appellate Division decision regarding state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

Second, even if the trial court's evidentiary ruling were erroneous, the error was not so crucial, critical, or highly significant as to deprive petitioner of his due process right to a fair trial. See Collins, 755 F.2d at 19. When viewed in light of the entire record, Quintero's testimony regarding Craig Young was not critical. Callabrass's identification testimony, based on his direct interactions with petitioner on two occasions and his observation of him on yet another, combined with his immediate recognition of petitioner in the police line-up, was more than sufficient to convict petitioner of the murder of Bradley Durant. Furthermore, Callabrass's account of the events was corroborated by Frazier's testimony that he drove petitioner to the exact block where the shooting occurred. Quintero's testimony, in contrast, offered only slight corroboration for Frazier's testimony by suggesting that Durant's next-door neighbor may have been the "Craig" to whose house Frazier drove. Even if this evidence were improperly admitted, therefore, its admission was not so crucial, critical, or highly significant as to implicate due process concerns. See id.

## CONCLUSION

For the reasons stated above, the instant petition for a writ of habeas corpus is denied and this action is dismissed. Since petitioner has not made a substantial showing of the denial of a constitutional right, no certificate of appealability is granted. See 28 U.S.C. § 2253(c)(2); Lozada v. United States, 107 F.3d 1011, 1017 (2d Cir. 1997) (discussing the standard for issuing a certificate of appealability), abrogated on other grounds in United States v. Perez, 129 F.3d 255, 259-60 (2d Cir. 1997).

SO ORDERED.

/SANDRA L. TOWNES
United States District Judge

Dated: July 30, 2009
Brooklyn, New York